IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. CR08-105-S-EJL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM ORDER** |
| | ) | |
| JOSE BERNAL MOLINA, III, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Before the Court in the above entitled matter is Defendant Jose Molina's motion to suppress. The Court heard arguments on the motion on April 29, 2009. The Court directed counsel to submit additional briefing which the Court has received. Having considered the evidence presented and the arguments of the parties the Court finds as follows.

### FACTUAL BACKGROUND

In the late evening on March 19, 2008, Boise City Police Officer Dave Burgard was patrolling a home that he had previously received a complaint about from a neighbor. He observed a white passenger vehicle parked in front of the house as he drove by and then moments later saw the same vehicle exiting the neighborhood. Officer Burgard followed the vehicle and observed it cross the lane divider by approximately three to four feet. At 11:03 p.m. Officer Burgard initiated a traffic stop for failure to maintain lane. Officers Terry Phillips and Kip Paporello arrived shortly thereafter to assist.

Officer Burgard approached the driver of the vehicle, Mr. Molina, and informed him

that  he had been stopped for failure to maintain his lane of travel.  When asked for his license, registration, and insurance, Mr. Molina produced an Idaho Department of Corrections identification card and stated that he could not find his driver's license.  While Mr. Molina searched for his driver's license, Officer Burgard inquired about the identification card.  Mr. Molina responded that he had been in prison for possession of methamphetamine and that he had "topped out" his sentence.  During this time, Officer Phillips was stationed at the passenger side of the vehicle and identified the passenger as Corrina Garcia.  Mr. Molina located his driver's license and produced it to Officer Burgard who to took it and returned to his patrol vehicle to process the information.  Officer Burgard testified that the information returned from dispatch was that there were no wants and/or warrants out for the individuals.[1]  Thereafter, Officer Burgard testified that he began writing a citation for the traffic violation on the back of his patrol car.[2]

Officer Burgard testified that one of the assist officers called for the K-9 Unit.  The dispatch log reflects that K-9 Officer Shane Williams and his drug detection dog Pyro were en route at 11:07 p.m. and arrived on scene at 11:24 p.m., twenty one minutes after the initial stop.  (Ex. 1).  Two or three minutes later, Mr. Molina and Ms. Garcia were asked to exit the vehicle and sit at the curb while Pyro sniffed the car.  Officer Burgard testified that he continued filling out the citation while the dog sniffed the car.  At this time, Officer Burgard

---

[1]  The defense disputes that Officer Burgard ever ran the Defendant's information because it is not reflected on the dispatch log.  (Dkt. No. 24, p. 3).  The testimony of the Officers at the hearing revealed the dispatch log to be different in many respects from the Officers' memories of the evening.  (Transcript Record, p. 17-18).

[2]  The traffic citation was never issued to Mr. Molina and has since been shredded.  (Transcript Record, p. 30-31).

**Memorandum Order -- Page 2**

asked Mr. Molina if he would mind emptying his pockets to which he agreed and removed a glass marijuana smoking pipe. (Ex. 2). Moments later Pyro alerted on the vehicle. (Ex. 2).

Officer Burgard then handcuffed Mr. Molina and asked him if there was additional drug paraphernalia and/or illegal contraband on his person. Mr. Molina responded to having some "weed" in his pocket. Officer Burgard located and removed a small plastic baggie with a green leafy substance later determined to be marijuana from Mr. Molina's front right coin pocket. Mr. Molina was then placed in Officer Burgard's patrol vehicle.

After Pyro altered on the car, the assisting Officers searched the vehicle. Wedged between the driver's seat and the center console, Officer Phillips discovered a FEG, Model GKK-45, .45 semi-automatic pistol, bearing serial number AA000521. As a result of the evidence found in the search, Mr. Molina has been charged with two counts of unlawful possession of a firearm and criminal forfeiture. (Dkt. No. 1). Mr. Molina has filed the instant motion to suppress which the Court now takes up.

## DISCUSSION

Mr. Molina challenges that the traffic stop was unlawfully prolonged beyond the time reasonably required to complete the purpose of the stop, which was to issue a traffic citation. (Dkt. No. 20). The Government maintains that the length of the stop was reasonable given: Officer Burgard was still writing the citation when the K-9 Unit arrived and the dog sniff took on a few minutes. (Dkt. No. 22). Further, the Government asserts that Officer Burgard had a reasonable articulable suspicion given his observation of the Defendant's vehicle

parked at a "known drug house," then leaving the house, late in the evening, and the fact that

Mr. Molina had a prior conviction for possession of a controlled substance.  (Dkt. No. 22).

I.      Length of Stop

The constitutionality of an investigative detention is judged under the framework

established in Terry v. Ohio, requiring that an investigative detention may "last no longer

than is necessary to effectuate the purpose of the stop."  392 U.S. 1, 30 (1968).  Here, the

parties do not dispute that Officer Burgard had sufficient probable cause to effectuate the

stop of the vehicle for failure to maintain lane.  The question here is whether the length of

the stop was unreasonable.  The defense argues the stop should have been concluded sooner

than the twenty plus minutes it took in this case.  The defense points out that during the stop

Mr. Molina was cooperative, produced the requested documents, and his record check came

back clear.  Further, the defense argues that no citation was ever issued or filled out

indicating the Officers never intended to issue a citation but only to delay the stop until the

K-9 Unit arrived.

Both parties discuss the Supreme Court opinion in Illinois v. Caballes, 543 U.S. 405

(2005) where an officer initiated a routine traffic stop for speeding.  There, a K-9 officer

overheard the dispatch and, on his own, proceeded to the scene and conducted a dog sniff of

the exterior of the vehicle.  The dog alerted on the trunk and a subsequent search revealed

marijuana.  The stop lasted less than ten minutes.  Certiorari was granted to decide the

"narrow" issue of "[w]hether the Fourth Amendment requires reasonable, articulable

suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic

stop." <u>Id.</u>  The Court held that a "dog sniff performed during a traffic stop does not violate the Fourth Amendment" but that "a lawful seizure 'can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" <u>Muehler v. Mena</u>, 544 U.S. 93, 101 (2005) (quoting <u>Caballes</u>, 543 U.S. at 407).  The Supreme Court "rejected the notion that the shift in purpose from a lawful traffic stop into a drug investigation was unlawful because it was not supported by any reasonable suspicion." <u>Id.</u> (citation and quotations omitted).

The Supreme Court's has "held repeatedly that mere police questioning does not constitute a seizure" and thus no separate reasonable suspicion is required to justify questioning that does not prolong an initially lawful stop.  <u>United States v. Turvin</u>, 517 F.3d 1097, 1100 (9th Cir. 2008) (quoting <u>Muehler</u>, 544 U.S. at 101 and citing <u>United States v. Mendez</u>, 476 F.3d 1077, 1080 (9th Cir. 2007)).  Thus, where the officers' questioning does not extend the duration of a lawful stop, "the expanded questioning need not have been supported by separate reasonable suspicion." <u>Id.</u> at 1100.  Likewise, the Ninth Circuit has found that police questioning did not prolong a traffic stop where the entire encounter lasted approximately eight minutes, during which the police ran a records check and searched the vehicle.  <u>Mendez</u>, 476 F.3d at 1080-81.  Most recently, the Supreme Court "made plain," that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." <u>Arizona v. Johnson</u>, 129 S.Ct. 781, 788 (2009) (citation omitted).

**Memorandum Order -- Page 5**

Although the dispatch log here does not show that Officer Burgard ran Mr. Molina through dispatch, he testified that he did so that night.  (Transcript Record, p. 21).[3]  Officer Burgard described how information is ran through dispatch and that it often takes a little time for dispatch to return with the information requested.  On the night in question, Officer Burgard testified that it was a busy Friday night.  On cross examination, it was clarified that March 19, 2008 was in fact a Wednesday night.  (TR, p. 24).  Regardless, Officer Burgard maintained that radio traffic was "pretty busy" that night and that he remembered "waiting for my returns."  (TR, p. 26).

Officer Burgard further testified that he did not delay his normal traffic stop procedures to allow time for Officer Williams to arrive.  (TR, p. 18-19) ("100 percent of the time during my stop I was conducting investigation...and actively doing something related to that investigation.").  "To my recollection, the entire time that I was on the stop and before Officer Shane Williams arrived I was doing something.  So time may have passed and not realized while I was writing or gathering information or conducting radio wants and warrants checks.  But I was constantly doing something while I was on this stop."  (TR, p. 22-23).  He further testified that he was not yet done writing the traffic citation when Officer Williams arrived on scene.  (TR, p. 19).  Both Officers Philips and Williams also testified that Officer Burgard was writing up the ticket and finishing up the citation when Officer Williams arrived.  (TR, p. 47, 60).

The Government relies heavily upon the fact that Officer Burgard was still writing the

_____

[3]  Hereafter the Court will refer to the Transcript Record as "TR."

**Memorandum Order -- Page 6**

traffic citation when the K-9 Unit arrived on scene.  The Court does not doubt that it may take some time for an officer to complete a traffic citation and receive the return information from dispatch.  Here, however, the lone fact that Officer Burgard was not done with the traffic citation at the time Officer Williams arrived does not make the length of the stop reasonable.  Further, the traffic citation was never completed or issued and it has since been shredded.  This lends weight to the argument that this was never intended to be just a traffic stop, which is consistent with Officer Burgard's testimony that he was on a "fishing expedition."  (TR, p. 41, 70).

        As to the length of time it took for the K-9 Unit to arrive, Officer Williams stated that he responded immediately to the scene.  (TR, p. 54-55) ("I don't stop for coffee...when I get the call that is immediately where I go.").  The dispatch log reflects that at 11:07 p.m. Officer Williams was en route to the scene.  (TR, p. 19).  The log then reflects that at 11:24 p.m. Officer Williams arrived on scene.  (TR, p. 22).  Officer Burgard testified that he did not "remember it being that long at all" and that regardless of what the dispatch log shows that "[i]t was not a very long amount of time before he arrived."  (TR, p. 22, 28).  Officer Williams had no recollection regarding the exact time he was en route or on scene.  (TR, p. 44-47).  Officer Phillips testified that he believed Officer Williams arrived at the scene somewhere between five and nine minutes an that "it didn't seem all that long."  (TR, p. 58). Officer Phillips testified that in his experience he begins to get nervous when it takes a K-9 Unit somewhere along the lines of thirteen or more minutes to arrive on scene.  (TR, p. 59-60) ("So there is sort of this internal clock maybe that you have where you start getting

fidgety because it is taking a while?").  When asked if there was "ever a time in this case where you started getting that nervous feeling," Officer Philips responded "[n]o, sir."  (TR, p. 60).  Upon his arrival, Officer Williams testified that he waited two or three minutes for Officer Burgard to direct him before he began the dog sniff.  (TR, p. 48).[4]  After a couple of minutes, Officer Burgard informed Officer Williams of what "he had" and what he wanted the K-9 Unit to do.  (TR, p. 14-15, 47-48, 53).

Based on the record and the testimony, the Court finds that traffic stop was lawful but that it was unreasonably prolonged beyond the time necessary to complete its mission.  The encounter between the police officers and Mr. Molina up to the time of the arrest took over twenty minutes.  Officer Burgard's testimony that he was "investigating" the whole time and that he did not delay his activities to allow the K-9 Unit to arrive on scene does not square with the record.  The dispatch log shows the traffic stop was initiated at 11:03 p.m. and concluded over twenty minutes later.  Although each of the Officers who testified at the hearing noted discrepancies in the dispatch log, none of them questioned the starting or ending time for the stop.  Even taking the dispatch log as only a "rough outline," as described by Officer Burgard, it reveals that this stop was prolonged.  (TR, p. 17).

There is no bright-line rule for the length of a traffic stop but generally, a routine traffic stop might take 10 to 15 minutes to complete.  Though the stop here did not take a great deal longer than that, the dispatch log and the testimony of the Officers shows the

---

[4] This testimony is consistent with Officer Phillip's testimony that it was common practice for the primary unit to inform the K-9 Officer of what is going on at the traffic stop.  (TR, p. 60-61).  Again, the Officers all testified that Officer Burgard was still in the process of writing the citation when Officer Williams arrived.  (TR, p. 46, 60).

**Memorandum Order -- Page 8**

length was excessive.  A minute or two of the time could be attributable to Mr. Molina's own searching for his driver's license.  Those few minutes, however, do not explain the reason for the overall length of this traffic stop.  Officer Burgard testified that he was on a "fishing expedition" which explains why none of the Officers felt the stop was taking too long; this was more than just a routine traffic stop.  Officer Williams even testified that he had never been called to do a dog sniff to a routine traffic stop for failure to maintain lane.  (TR, p. 53). The only explanation for the length of this stop is that there was more going on than a routine traffic stop.  Having considered the totality of the circumstances, the record, briefing, evidence, and testimony, the Court finds the stop in this case was prolonged beyond the time reasonably required for the initial traffic stop.

A review of the mere written transcript might led one to believe the stop here was reasonable.  This Court, however, had the benefit of viewing the testimony of the Officers at the hearing first-hand.  Having done so it became evident that a great deal of the time of the stop did not "seem" or "feel" prolonged by the Officers but that there are numerous inconsistencies between the Officers' testimony and the record.  There were several inconsistencies in the testimony as to which Officer ran the two vehicle occupants, who called for the K-9 Unit, and when the K-9 Unit arrived.[5]  Further, certain key facts in the

---

[5]  Another example of the inconsistencies between the Officers' testimony and the record of the stop that night exists regarding when the dog alerted and when Officer Burgard discovered the marijuana pipe.  The occupants of the car were asked to exit the vehicle and sit on the curb beside Officer Burgard's police cruiser while the dog sniff occurred.  Officer Burgard continued to fill out the traffic citation while the dog sniff was going on and asked the Defendant for his current address.  (TR, p. 15).  Officer Burgard testified that he also asked Mr. Molina if he would empty his pockets whereupon Mr. Molina produced the marijuana pipe.  Officer Burgard testified that the dog had alerted prior to his question and prior to the marijuana pipe being produced.  (TR, p. 16, p. 42).  A review of the tape recording that night, however, reveals that Officer Burgard asked Mr. Molina to empty his pockets prior to the K-9 alert.  (Gov. Ex. 2).

Memorandum Order -- Page 9

Government's briefing are inaccurate.[6]  The lack of consistency between the record, the testimony, and the briefing leave the Court to rely more heavily on the actual record of the stop.  Here, although the dog sniff occurred within one or two minutes of Officer Williams arriving on scene, it was nearly twenty minutes into the stop before the dispatch log shows him arriving.  Even if the log is off by a minute or so, the dog sniff and alert did not occur until well into the stop.  Further, after his arrival on scene Officer Williams had to wait for Officer Burgard to direct him, the vehicle occupants were then removed, and then Officer Williams began the process of preparing his K-9 to search the vehicle.[7]  On whole, it became evident at the hearing that the reason for the stop was to undertake an investigation of possible drug related activities of anyone leaving the residence that night regardless of reasonable suspicion.  The Court finds that based upon the record, the stop was unlawfully prolonged and, therefore, separate Fourth Amendment justification was required to support the expansion of the stop.

---

[6]  In particular, the Government's brief repeatedly refers to the residence as a "known drug house."  (Dkt. No. 22).  Officer Burgard's testimony revealed that at the time of this stop it was not known whether the residence was a source of drugs.  (TR, p. 30).

[7]  Had the stop been reasonable and lawful, there would have been no error in the Officers directing the occupants to exit the vehicle.  Arizona v. Johnson, 129 S.Ct. 781, 786 (2009) ("'[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" This rule "applie[s] to passengers as well as to drivers.").

Memorandum Order -- Page 10

II.   <u>Reasonable Suspicion</u>

The Government argues that given the totality of the circumstances, the Officers here had a reasonable articulable suspicion to conduct the K-9 sniff and search of the vehicle.  The defense objects arguing there was no basis for expanding the scope of the traffic stop.  In particular, the defense challenges the Government's characterization of the house as a "known drug house."  Further, Officer Burgard's report, the defense argues, does not indicate that the stop was based on anything other than the failure to maintain his lane.  The Defendant contends that none of the facts here demonstrate particularized evidence that he was engaged in criminal activity.  The facts instead show, the defense asserts, that the Officer was looking for a reason to pull over the Defendant and delay the stop long enough to conduct a K-9 search.

Reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." <u>United States v. Thompson</u>, 282 F.3d 673 (9th Cir. 2002) (citation omitted).  In deciding whether an officer had a reasonable suspicion, the Court must consider the totality of the circumstances.  <u>United States v. Fernandez-Castillo</u>, 324 F.3d 1114, 1117 (9th Cir. 2003) (citing <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002)).  "All relevant factors must be considered in the reasonable suspicion calculus–even those factors that, in a different context, might be entirely innocuous." <u>Id.</u>  An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also "be grounded in objective facts and be capable of

rational explanation." <u>United States v. Mariscal</u>, 285 F.3d 1127 (9th Cir. 2002) (citing <u>United States v. Lopez-Soto</u>, 205 F.3d 1101, 1105 (9th Cir. 2000) and <u>United States v. Twilley</u>, 222 F.3d 1092, 1095 (9th Cir. 2000)).  "While an officer should consider these factors in light of [their] experience... 'experience may not be used to give the officers unbridled discretion to make a stop." <u>Id.</u> (citations omitted).

     A.     <u>Information About the Home</u>

On the night in question, Officer Burgard was patrolling an area and house that a neighbor had previously complained about.  The neighbor had called the police service phone line a couple of weeks prior to the stop to make a complaint about the house.  Officer Burgard returned her call.  Officer Burgard testified that the neighbor "was very distraught about the activity that was going on.  She said – she mentioned that she had a child and she was afraid just to go back and forth to her car with her child.  She said that she herself was a prior user and, therefore, that she recognized the signs of it, and that she could actually see people in the backyard of the residence actively using methamphetamine."  (TR, p. 66-67).  The neighbor also told Officer Burgard there was a lot of traffic in and out all hours of the night" and "different cars all the time."  (TR, p. 67).  The neighbor stated to Officer Burgard that she lived "one residence to the west" of the house but did not give an address or physical description of the house.  (TR, p. 67).  Officer Burgard testified that the neighbor did not say how long she had witnessed the activity nor give any specific details about the location other than that "She was just persistent that it was definitely narcotics related based on her previous knowledge and experience, and that she was afraid for herself and her child just to

walk back and forth to her car." (TR, p. 67). Thus, the extent of the complaint was the neighbor's personal knowledge, observations, and her fear for her own safety. (TR, p. 68).

On cross examination, Officer Burgard testified that he never met face to face with the neighbor, had no physical address of the residence, never went to the home for knock and talk, and never assigned any other officers to investigate, and that he basically kept an eye on house for the two weeks between call and stop of Mr. Molina. (TR, p. 69-70). There was no testimony that the complaining neighbor was a known or reliable informant nor was Officer Burgard able to verify the information provided by the neighbor. After receiving the complaint, Officer Burgard testified that he watched the house but "there was no activity in front of the residence outside of it. So at that point I contacted my other are officer and kind of told him what happened. And he told me that he had had a similar complaint, I don't know how much prior before that, and so it was kind of the beginning of building and investigation of this residence." (TR, p. 68). He further testified that he did not see any suspicious people in front of the house, anyone smoking or using any narcotics, and observed no unusual traffic patterns. (TR, p. 70). Thus, Officer Burgard had no knowledge of the complaining neighbor's truthfulness, reliability, or possible motives or biases for making such a complaint and not been able to verify any of the information in the neighbor's

complaint.  Regardless, Officer Burgard testified that he was going to stop people who were leaving the house if he had a basis for the stop and that he was "going to go fishing."  (TR, p. 70).[8]

On March 19, 2008, Officer Burgard observed the Defendant's vehicle parked in front of the house and was seen leaving moments later.  The traffic stop occurred shortly thereafter.  When asked by defense counsel why his report did not reference the "drug house" Officer Burgard testified that:  "Well, at the time it was an alleged drug house.  As you said, I just had information from a neighbor possibly claiming there was activity there.  So it was not established, in my mind, as a known drug house.  So at the time of that stop, it was not relevant to my stop.  I had my own probable cause to stop the vehicle."  (TR, p. 30).

The Court finds the information from the neighbor regarding the residence does not provide a reasonable suspicion for Officer Burgard to have expanded the stop in this case. The complaining neighbor was unknown and her information was unconfirmed and vague. The house was not a "know drug house" at the time of the stop and there was no evidence to indicate that Mr. Molina was under the influence of any thing that evening.  (TR, p. 33).

B.    Idaho Department of Corrections ID and Prior Conviction

Upon approaching the vehicle, Officer Burgard testified that Mr. Molina was unable to located his driver's license and instead produced the Idaho Department of Corrections

---

[8]  Officer Burgard provided the same testimony when he was initially called to the stand:
Defense Counsel: "The point being, you were going to follow vehicles that left that residence and stop them for the first traffic infraction that they committed, weren't you?"
Officer Burgard: "Correct."
Defense counsel: "in fact, you did that with respect to Mr. Molina?"
Officer Burgard: "Yes, I did." (TR p. 29)

**Memorandum Order -- Page 14**

identification card.  Officer Burgard inquired of Mr. Molina regarding the identification card and discovered that he had served time for a prior drug related conviction.  This inquiry was appropriate.  However, after Officer Burgard checked Mr. Molina's information with dispatch it came back clear.  Thus, this was not a basis for expanding the scope of the traffic stop.

Moreover, Officer Burgard testified that Mr. Molina had not done anything to indicate that he had engaged in suspicious activity.  On cross examination, counsel asked:  "[a]t the time you made the traffic stop of Mr. Molina, you had no reason to believe he had engaged in any illegal activity other than the infraction you observed" and Officer Burgard responded "[c]orrect."  (TR p. 25).[9]  Officer Burgard testified that he did not suspect that the Defendant was driving under the influence; he did not smell the odor of alcoholic beverage or see glassy red shot – bloodshot eyes, anything along those lines.  (TR, p. 33) ("After I made contact with him I determined he was not under the influence.").  Officer Burgard further testified that the Defendant was cooperative, made no furtive movements, was compliant with all requests, and produced a current and valid driver's license, registration, and insurance information.  (TR, p. 32-34).[10]  Because there was no indication that the Defendant was under

---

[9]  (TR, p. 30)

Defense Counsel: When you stopped Mr. Molina, he was stopped solely for the purpose of failing to maintain a lane?
Officer Burgard: Correct
Defense Counsel: A routine infraction traffic stop?
Officer Burgard: Yes.

[10]  The following is the actual transcript testimony of this exchange (TR, p. 32-34):

Defense counsel: So when you say your reason for the stop was not the citation itself, in fact, sir, your reason for the stop was really to see if Mr. Molina was involved in drug-related activity; is that true?
Officer Burgard: Yes.

**Memorandum Order -- Page 15**

the influence of anything and his records check came back clear, there was no reasonable

suspicion to investigate further.

      C.     <u>K-9 Unit</u>

      At some point during the stop one of the Officers requested a K-9 Unit.  It is unclear

who made this request given the inconsistencies between the dispatch log and the testimony

at the hearing.  Officer Burgard testified that one of the other assisting Officers requested the

K-9 Unit in coordination with him but that he did not "tell the other officers" to get the drug

dog.  (TR, p. 35).  This is problematic.  Based on the record before the Court, Officer

Burgard was the only Officer who could have possibly had reasonable suspicion to justify

---

Defense counsel: An you had no basis for making that stop, did you?
Officer Burgard: I did.
Defense counsel: You had no basis for making a drug-related stop, did you?
Officer Burgard: I conducted a traffic stop based on a traffic infraction.
Defense counsel: Right.  But you said that your basis for making the stop was to check for drug-related activity, not for really stopping him for the traffic violation, correct?
Officer Burgard: I misspoke.  The basis for my stop was the traffic violation.  However, there was the potential for a drug investigation.
Defense counsel: But all of your conduct after the initial traffic stop was really related to investigating drug activity as opposed to the traffic stop, true?
Officer Burgard: Well, the Defendant did present me with an Idaho Department of Corrections ID card and told me he was locked up for possession of a controlled substance.
Defense counsel: So you think that somebody who has a prior criminal record should automatically be investigated because they are more likely to commit crimes in the future?
Officer Burgard: I believe that somebody with an admitted prior criminal history of a specific crime should be further investigated than beyond a typical infraction.
Defense counsel: Even if they have done nothing wrong?
Officer Burgard: Yes
Defense counsel: So when you stopped Mr. Molina, you did not suspect that he was driving under the influence, did you?
Officer Burgard: When I made contact with him or when I stopped him?
Defense counsel: When you made contact.
Officer Burgard: After I made contact with him I determined he was not under the influence.
Defense counsel: You didn't smell the odor of alcoholic beverage or see glassy red shot – bloodshot eyes, anything along those lines, did you?
Officer Burgard: I did not
Defense counsel: Mr. Molina was cooperative with you?
Officer Burgard: He was.
Defense counsel: No furtive movements, compliant with all requests, current and valid driver's license, registration.

**Memorandum Order -- Page 16**

expanding the traffic stop into a drug related stop.  The only assisting Officer on scene that night who testified at the hearing did not have any basis for expanding the traffic stop.  In fact , Officer Philips testified that it was a traffic stop, he did not listen to Officer Burgard's conversation with the driver, and he did not have any duties or responsibilities that night other than to assist.  (TR, p. 59-60).  If one of the assisting Officer's called for the K-9 Unit on their own without the direction from Officer Burgard, as Officer Burgard testified, there was no basis for doing so.

Moreover, even if Officer Burgard called for the K-9 Unit himself, he did not possess reasonable suspicion.  On redirect, Officer Burgard testified that he was asked "[w]ere you suspicious that drug activity might be involved when you observed the Defendant commit the traffic infraction" to which he responded "[y]es" but provided no further testimony or basis for his suspicions.  (TR, p. 41).  With no testimony from Officer Burgard as to the basis for his suspicion, Court then is left only to presume that the basis was either the information regarding the house, the time of night, and the fact of the Defendant's prior conviction.  Officer Williams testified that he was told by Officer Burgard that "he had run a criminal record on the person he had stopped and that they did have a prior conviction for drug violations.  He also said that he was doing an investigation on a possible drug house and said he had that also.  The fact that it was pretty late at night.  Then also had mentioned there was some gang affiliation with the person he had stopped." (TR p. 55).[11]  As determined herein, these reasons are not a basis for reasonable suspicion in this case.  Officer Burgard

---

[11]  This was the only reference to any gang affiliation in this case.  Because there was no other mention of possible gang affiliation, the Court has not considered this as a basis for reasonable suspicion.

**Memorandum Order -- Page 17**

testified that he did not have a basis to believe the house was a "drug house" at the time of this stop.  Further, the fact that the Defendant had a prior conviction may have raised some suspicion but it does not give officers cart blanc to effect a search.  This is especially true where, as here, there was no basis for any suspicion that the Defendant was under the influence and his record check was clean.  (TR, p. 13) (Officer Burgard testified that both individuals came back clear when he ran them in the system.).  At that point there was no basis to expand the stop and Officer Burgard should have issued the traffic citation and concluded the stop.

Further, the Court finds that the K-9 alert does not cure the lack of reasonable suspicion for the expansion of the traffic stop in this case.  Officer Burgard testified that after the dog alerted on the outside of the vehicle his suspicions of drug activity were increased. (TR, p. 41-42).   Had there been a basis for extending the traffic stop and requesting the K-9 Unit, the dog alert may have provided reasonable suspicion.[12]  Here, however, there was no reasonable suspicion and the dog alert did not occur until the stop had already been unlawfully prolonged.

Based on the totality of the circumstances, the Court concludes that the Officers lacked a reasonable articulable suspicion to prolong and expand the stop.  The facts known to the Officers included the observation of the vehicle parked at a house where there had been a complaint filed but no independent verification of any suspicious activity, it was very

---

[12]  A dog alert during a traffic stop may provide probable cause to believe that a car contains drugs, the Officers have a new justification to extend a traffic stop.  Berkemer v. McCarty, 468 U.S. 420, 439- 40 (1984) (stop can be extended if detainee's answers to question provide probable cause to arrest him); Florida v. Royer, 460 U.S. 491, 506 (1983) (positive dog alert would justify turning investigative detention into arrest).

**Memorandum Order -- Page 18**

late in the evening, and the fact that Mr. Molina's had a prior drug conviction but no outstanding wants or warrants.  These facts are simply inadequate upon which to find reasonable suspicion.

### ORDER

Based on the foregoing and being fully advised in the premises, the Court HEREBY ORDERS that the Defendant's Motion to Suppress (Dkt. No. 20) is **GRANTED**.  The parties are directed to confer and advise the Court as to how they intend to proceed by filing a joint written notice in this matter within five days of the date of this Order.

**IT IS SO ORDERED**.

DATED:  **May 19, 2009**

Honorable Edward J. Lodge
U. S. District Judge